*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 10a0148p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

————————————

R.C. OLMSTEAD, INC.,

    *Plaintiff-Appellant,*

  *v.*

               No. 09-3428

CU INTERFACE, LLC; THOMAS BURKHART;
SOFTWARE PROPERTIES, LLC,

     *Defendants-Appellees.*

> Appeal from the United States District Court
> for the Northern District of Ohio at Akron.
> No. 08-00234—Sara E. Lioi, District Judge.

Argued: April 28, 2010

Decided and Filed: May 19, 2010

Before: GIBBONS, ROGERS, and KETHLEDGE, Circuit Judges.

————————————

**COUNSEL**

**ARGUED:** David A. Campbell, III, VORYS, SATER, SEYMOUR AND PEASE LLP, Cleveland, Ohio, for Appellant. Andrew Mills Holford, ANNELLI HOLFORD, LTD., Dublin, Ohio, for Appellees. **ON BRIEF:** David A. Campbell, III, VORYS, SATER, SEYMOUR AND PEASE LLP, Cleveland, Ohio, Daniel J. Clark, VORYS, SATER, SEYMOUR AND PEASE LLP, Columbus, Ohio, for Appellant. Andrew Mills Holford, ANELLI HOLFORD, LTD., Dublin, Ohio, for Appellees.

  ROGERS, J., delivered the opinion of the court, in which GIBBONS, J., joined. KETHLEDGE, J. (p. 21), delivered a separate concurring opinion.

————————————

**OPINION**

————————————

  ROGERS, Circuit Judge. R.C. Olmstead appeals the district court's grant of summary judgment to defendants in this copyright and trade secret infringement case brought by one provider of credit union software against the developer of a competing credit

1

union software. Olmstead challenges several of the district court's discovery rulings, which Olmstead argues unfairly inhibited its ability to prove its claims. Among other things, the district court rejected plaintiff's inadequate expert report under F.R.C.P. 26, and refused to draw adverse inferences based on a third party's destruction of evidence. The district court granted summary judgment for defendant CUI after determining that Olmstead had failed to raise a genuine issue of material fact as to whether CUI created its software by copying Olmstead's software, and that Olmstead's end use product was not a trade secret. Because the district court did not abuse its discretion with respect to its subsidiary rulings, and because Olmstead did not create a genuine issue of material fact with respect to either the copyright claim or the trade secret claim, the district court properly granted summary judgment.

I.

R.C. Olmstead, Inc., ("Olmstead") develops and sells data processing software, hardware, and related services to credit unions. One of the credit unions to which Olmstead sold its software was Canton School Employees Federal Credit Union ("the CSE Credit Union"). In 1999, Olmstead and the CSE Credit Union entered into a data processing agreement whereby Olmstead licensed the use of its hardware and RCO-1 credit union processing software to the CSE Credit Union for a term of five years. Under the terms of the agreement, Olmstead provided several pieces of hardware, including the server upon which the RCO-1 software was to run. The server contained the executable version of the Olmstead code, which used emulators to run the software through "dumb terminals," which could be emulated by personal computers connected to the server. The agreement did not expressly limit access to the software or the emulators on which it would run, but the agreement did state that Olmstead would maintain ownership of all software and hardware. On the subject of support, the agreement stated: "Personal computers may be integrated with the R.C. Olmstead system through the use of terminal emulation software. It is the Credit Union's responsibility to acquire a local Personal Computer support firm to perform maintenance, and support of all personal computers."

As permitted by the agreement, the CSE Credit Union hired CU Interface, LLC, and its independent contractor, Thomas Burkhardt (collectively "CUI"), a developer, marketer

and seller of credit union data processing software, to provide its maintenance and support. Among other things, CUI had developed a terminal emulation program that enabled older dumb terminal applications, such as RCO-1, to run on personal computers using Windows. In 2003, CUI and the CSE Credit Union entered into a Software Development Agreement to develop a credit union data software processing system. Under the terms of the development agreement, the CSE Credit Union identified certain software programs that CUI was to develop according to a schedule contained in the agreement. The CSE Credit Union was to pay CUI a development fee, retain a perpetual license to use the software programs that were developed, and have an option to purchase a 30% ownership interest in the software catalog.

As part of the development process, CUI programmer Jason Akin interviewed several CSE Credit Union employees regarding their needs in developing credit union software. Neither CUI nor the CSE Credit Union placed limits on what Akin could discuss during these interviews, and Akin asked at least one teller, Tracie Rodriguez, about her experiences with the Olmstead software. During this time, Akin was provided with a teller-level username and password to the Olmstead software at the CSE Credit Union facility. This allowed him to access the RCO-1 interface, but not its source code. Akin testified at his deposition that he accessed the Olmstead software several times per week over the course of the development project.

One of CUI's other main programmers, Jay Lash, was a former CSE Credit Union teller with some educational background in computer programming. Lash began to do small projects for CUI in early 2004, while he was still employed by the CSE Credit Union, and he joined CUI officially in 2005. Lash testified that, while employed at CUI as an independent contractor (and later as an employee of CUI), he wrote most of the interface for the CUI software—the visual representation of the program on the computer screen that the customers and tellers would see. Lash was familiar with the Olmstead interface from his time as a teller, but he also testified that he had worked with a few different systems. Lash testified that all of the software systems with which he had worked had the same basic functions, but that Olmstead's software was an account-based system, whereas CUI's software was a person-based system. While he was employed at CUI, Lash retained his CSE

Credit Union username and password, and he also interviewed several CSE Credit Union employees about their needs regarding credit union software.

As CUI developed portions of its software, the CSE Credit Union ran those programs alongside the Olmstead software. One CSE Credit Union employee, Tracie Rodriguez, testified as follows about the final transition from Olmstead to CUI software:

A.   What I remember is that one day we were using R.C. Olmstead and the next day we were not.

Q.   Okay, so by taking that answer, am I correct that you don't remember any formal training as to hey, here it is, it's just a seamless transition?

A.   That I can recall, yes.

Q.   Okay. Do you recall it being a seamless transition?

A.   There was work involved. I mean, there was [sic] problems at first.

Rodriguez also testified that she received training on the CUI interface software, but that she could not recall when she received that training. Lash testified that there was "a lot" of support for employees when the conversion from Olmstead to CUI software took place, and that there was "quite a bit" of training on the new system, although Lash could not recall exactly how much. Lash testified that overall, there were "a couple weeks" dedicated to explaining the new software to CSE Credit Union employees.

Olmstead and the CSE Credit Union extended their original license agreement, but Olmstead exercised its option to terminate the agreement when it discovered that the CSE Credit Union was developing its own software. Olmstead informed the CSE Credit Union that it would be collecting the hardware and software leased to the CSE Credit Union under the terms of the agreement. When the CSE Credit Union learned that the representative sent by Olmstead to collect the hardware was accompanied by a third-party computer forensic analyst, the CSE Credit Union refused to allow Olmstead to remove the software because of concerns over the customer financial information stored on the server. Olmstead wanted to have the server examined by a computer forensic expert because it believed those experts could determine whether and when CUI employees had access to the literal elements of the Olmstead software, the Olmstead source code. The CSE Credit Union's CEO, Stanley Barnes, eventually destroyed the servers by drilling holes through them.

Olmstead brought suit against CUI, the CSE Credit Union, and Burkhardt, alleging misappropriation of trade secrets, tortious interference with contractual and business relationships, copyright infringement, violations of the Digital Millennium Copyright Act (DMCA), unjust enrichment, breach of contract, and spoliation. During discovery, the parties agreed to a protective order, under which discovery material was classified as "highly confidential," which only experts and attorneys could view; and "confidential," which the parties could view in addition to experts, counsel and their staff. Defendant CUI stated that no Olmstead employee would be able to view the CUI end use product—its software interface—and Olmstead filed a motion to compel discovery, stating that it needed access to CUI's interface to show that the two software products were substantially similar. The district court determined that CUI's end use product should be classified as highly confidential material under the protective order and could only be viewed by experts and counsel.

Olmstead retained Robert Reid as its only expert witness, and CUI provided Reid with access to its software in controlled conditions. Reid filed a two-page expert report and attached nearly two-hundred pages of exhibits showing various screenshots of the Olmstead and CUI interfaces. CUI moved to bar the use of Reid's report for failure to comply with Federal Rule of Civil Procedure 26(a), which requires that expert reports be detailed and complete, and for failing to meet the requirements of Federal Rules of Evidence 402 and 702. Olmstead argued in response that "Reid's report plainly complies with Rule 26(a)(2)(B)," and submitted a more detailed declaration from Reid that identified specific similarities between the interfaces of the Olmstead and CUI software and contained some of the specific information required by Rule 26(a), such as Reid's compensation and his history as an expert witness.

The district court granted CUI's motion to bar the use of Reid's testimony after determining that the report failed to comply with Federal Rule of Civil Procedure 26(a)(2)(B). The court reasoned that Reid's report failed to satisfy five of the six requirements listed in Rule 26(a)(2)(B) and thus could not be used under Federal Rule of Civil Procedure 37(c)(1). The court stated that "Reid woefully fails to provide any reasoning or logical support for his conclusions. Reid vaguely lists a sampling of 'similarities' between the [Olmstead] and CU Interface softwares, but he never explains why the alleged

similarities indicate actual copying of Plaintiff's software rather than that the softwares simply perform similar functions (and thus would be expected to function similarly)." Because the court barred the use of Reid's report for failing to comply with Rule 26(a), the court did not address CUI's argument that the court should exclude the report under the Federal Rules of Evidence.

Following the exclusion of Reid's report, CUI filed a motion for modification of the case management order. CUI stated that it did not intend to use any expert testimony for summary judgment practice, and therefore requested that the court not require the defendants to identify experts and provide reports until 45 days after ruling on the parties' motions for summary judgment. Olmstead protested, arguing that CUI should be required to comply with the case management order. Olmstead stated that it had already assembled a workstation for Craig Minch, one of CUI's experts, to view and compare the software programs, and that dismantling and rebuilding the workstation after summary judgment would create a burdensome expense. The court and the parties agreed to modify the case management order as requested by CUI, but the parties also agreed that CUI would provide an expert report from Minch by the original deadline. Shortly after CUI provided Olmstead with Minch's report, Olmstead attempted to subpoena Minch for deposition, but CUI objected and argued that Olmstead could not depose Minch until after the court had ruled on the pending summary judgment motions. The court requested briefing on the matter, and CUI submitted a brief stating that it had re-classified Minch as a non-testifying expert and that Minch was therefore not subject to deposition.

The district court held that because Minch was a non-testifying expert, Olmstead was not entitled to depose him. The court examined the case law on whether a party could shield an expert from deposition by re-classifying that expert as a non-testifying expert and determined that the majority rule that such a move did shield an expert from deposition was consistent with the purposes of the Federal Rules of Civil Procedure governing discovery of expert witnesses. The court determined that "[Olmstead] may not depose Minch unless and until Minch is designated as a testifying expert witness," and that "[i]n the event Minch is redesignated as a testifying witness but [Olmstead] is not given an adequate opportunity to depose him before trial, the Court will consider an appropriate motion at that time."

The parties filed cross motions for summary judgment, but before the district court ruled on those motions, the CSE Credit Union and Olmstead reached a settlement agreement and the CSE Credit Union was dismissed as a party to the case. The district court then granted summary judgment for CUI on all of Olmstead's remaining claims. The court determined that Olmstead was not entitled to any adverse evidentiary inference against CUI for the CSE Credit Union's alleged spoliation of evidence because Olmstead had not alleged any fault on the part of CUI. The court also determined that there was no evidence in the record to indicate that CUI had accessed Olmstead's source code, and that although CUI had access to Olmstead's end use product based on the teller-level access to the CSE Credit Union's programs, the RCO-1 interface was not a trade secret protected under Ohio law and CUI had not engaged in any misappropriation as defined by Ohio law. Finally, the district court determined that Olmstead had not produced any direct evidence of copying to sustain a copyright infringement claim, and its indirect evidence was insufficient to create a question of fact as to whether copying occurred.[1] Olmstead filed this timely appeal.

## II.

### A. Discovery Issues

1. The Protective Order

The district court did not abuse its discretion in denying Olmstead employees access to the CUI end use product (the CUI software interface) because the district court's decision to grant Olmstead's experts access to the software properly balanced the need for Olmstead to have access to relevant and necessary information with CUI's interest in preventing a potential competitor from having access to its software.

In response to discovery requests for access to the CUI software, CUI asserted that its end use product—the "Circa 2005 CUPD" software—contained trade secrets and that the disclosure of that software to a competitor could cause CUI considerable harm. Olmstead contended that its employees were in the best position to evaluate the software

---

[1] The court also granted summary judgment for CUI on Olmstead's DMCA claim, Olmstead's tortious interference with contractual and business relationships claim, and Olmstead's unjust enrichment claim. Olmstead has not challenged those decisions on this appeal.

because those employees are also familiar with Olmstead's software. The district court resolved the issue by allowing Olmstead's expert to review and run the CUI software in the presence of counsel at a location mutually agreeable to both parties. The court reasoned that the parties had reached an agreement that information designated "Highly Confidential Material" could only be viewed by counsel and experts, and noted that Olmstead had not challenged CUI's position that its end use product contained trade secrets. Federal Rule of Civil Procedure 26(c)(1)(G) permits a district court to require that "a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only a specified way." "It is within the sound discretion of the trial court to decide whether trade secrets are relevant and whether the need outweighs the harm of disclosure. Likewise, if the trade secrets are deemed relevant and necessary, the appropriate safeguards that should attend their disclosure by means of a protective order are also a matter within the trial court's discretion." *Centurion Indus., Inc. v. Warren Steurer & Assocs.*, 665 F.2d 323, 326 (10th Cir. 1981). Balancing the competing interests, the district court decided that the CUI interface would be treated in the manner that the parties had agreed would be appropriate for highly confidential material. As the district court stated, "Limiting the review of CU Interface's software to Olmstead's experts and counsel will assist Olmstead in defining the nature of its copyright infringement claims while protecting CU Interface's trade secrets and proprietary information." While the court limited access to CUI's software to Olmstead's expert and counsel, Olmstead also had opportunities to depose CUI employees who had worked with both Olmstead and CUI software.

To show the district court abused it discretion in allowing only Olmstead's counsel and expert access to the CUI software, Olmstead points to this court's unpublished opinion in *Bell Data Network Communications, Inc. v. Symbol Technologies, Inc.*, 114 F.3d 1186 (6th Cir. 1997) (table), but that case is inapposite. In *Bell*, this court held that a district court abused its discretion by not allowing the plaintiffs adequate time for discovery when the district court disregarded its own continuance allowing the plaintiffs to depose witnesses whose affidavits the defendants used in their motion for summary judgment. *Id.* at *2. We also noted that the district

court had stated that the plaintiffs were given six-and-one-half months for discovery when discovery had only been open for five-and-one-half months and the parties were preoccupied with legal motions during three of those months. *Id.* Olmstead can point to no similar errors of fact or law in the district court's decision to deny Olmstead employees access to CUI's software; therefore the district court did not abuse its broad discretion in refusing to compel additional discovery.

2. Robert Reid's Expert Report

The district court did not abuse its discretion in barring the use of Robert Reid's expert report because the report failed to comply with the requirements of Federal Rule of Civil Procedure 26(a)(2)(B). Reid's two-page report did not meet Rule 26(a)(2)(B)(i)'s requirement that an expert report be "a complete statement of all opinions the witness will express and the basis and reasons for them." Federal Rule of Civil Procedure 37(c)(1) states that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Although Olmstead argues before this court that any deficiencies in Reid's report were harmless and remedied by the submission of an affidavit further explaining Reid's report, Olmstead did not argue harmlessness before the district court. Instead, Olmstead argued only that Reid's expert report met the requirements of Rule 26(a). Because Reid's expert report did not satisfy Rule 26(a)(2)(B) and Olmstead did not meet its burden of showing that the error was justified or harmless, the district court did not abuse its discretion in excluding the report.

> Rule 26(a)(2)(B) requires all expert reports to contain the following:
>
> (i) a complete statement of all opinions the witness will express and the basis and reasons for them;
> (ii) the data or other information considered by the witness in forming them;
> (iii) any exhibits that will be used to summarize or support them;
> (iv) the witness's qualifications, including a list of all publications authored in the previous 10 years;

(v) a list of all other cases in which, during the previous four years, the witness testified as an expert at trial or by deposition; and
(vi) a statement of the compensation to be paid for the study and testimony in the case.

The district court clearly outlined the deficiencies in Reid's report. Most troubling of the violations that the district court described is Reid's failure, in violation of Rule 26(a)(2)(B)(i), to give "a complete statement of all opinions the witness will express and the basis and reasons for them." Reid provided only cursory support for his conclusion that the "CU[I] software was developed by copying the Olmstead software." Reid did identify four examples of similarities between the CUI and Olmstead software and stated that he could identify other similarities, but he failed to discuss the basis of his conclusion that the alleged similarities were the result of copying of the Olmstead software by CUI. "[A]n expert opinion must 'set forth facts' and, in doing so, outline a line of reasoning arising from a logical foundation." *Brainard v. Am. Skandia Life Assur. Corp.*, 432 F.3d 655, 657 (6th Cir. 2005). After reading Reid's report, CUI was only slightly more informed about the basis of Olmstead's argument that CUI had copied Olmstead than CUI would have been by merely reading Olmstead's complaint. The lack of reasoning describing why any alleged similarities indicated copying, Reid's statement that he could identify other similarities, and Reid's failure to tie any alleged similarities between the CUI and Olmstead software to the screenshot exhibits in the appendix together show that the report failed to meet the requirements of the rule. Under Rule 26(a), a "report must be complete such that opposing counsel is not forced to depose an expert in order to avoid an ambush at trial; and moreover the report must be sufficiently complete so as to shorten or decrease the need for expert depositions and thus to conserve resources." *Salgado v. Gen. Motors Corp.*, 150 F.3d 735, 742 n.6 (7th Cir. 1998) (citing *Sylla-Sawdon v. Uniroyal Goodrich Tire Co.*, 47 F.3d 277, 284 (8th Cir. 1995)). "Expert reports must include 'how' and 'why' the expert reached a particular result, not merely the expert's conclusory opinions." *Id.* Reid's report plainly failed to clear this hurdle.

In arguing that Reid's report satisfied Rule 26(a), Olmstead asserts that much of the information not contained in the report was already known to the opposing parties and the court. Specifically, Olmstead points to the production of Reid's resume prior to the production of the report, and the fact that the district court and CUI determined the manner of Reid's review of the software. However, these arguments do not remedy the critical error in the report—its failure to explain the basis for Reid's conclusion. On this critical point, Olmstead states only that "Reid viewed the features of the two software products and concluded that the similarities between them were such that copying was obvious." Without more explanation of how Reid came to this conclusion, the report does not satisfy the requirements of Rule 26(a).

Federal Rule of Civil Procedure 37(c)(1) states that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Because Reid's report failed to meet the requirements of Rule 26(a), the district court did not abuse its discretion in barring Olmstead from using the report under Rule 37(c)(1). "Federal Rule of Civil Procedure 37(c)(1) requires absolute compliance with Rule 26(a), that is, it 'mandates that a trial court punish a party for discovery violations in connection with Rule 26 unless the violation was harmless or is substantially justified.'" *Roberts v. Galen of Virginia, Inc.*, 325 F.3d 776, 782 (6th Cir. 2003) (quoting *Vance v. United States*, No. 98-5488, 1999 WL 455435, at *3 (6th Cir. June 25, 1999)). The burden is on the potentially sanctioned party to prove harmlessness. *Id.* Because Olmstead argued before the district court only that Reid's report plainly satisfied Rule 26(a) and did not argue that any deficiencies were justified or harmless, the district court did not abuse its discretion in excluding the report.

Olmstead argues, for the first time on appeal, that "[r]egardless of whether Reid's report strictly complied with Rule 26, the exclusion of his testimony was unwarranted." The thrust of Olmstead's argument is that because CUI was not required to identify its own expert until several months after the production of Reid's initial report and because

any deficiencies in Reid's report were cured by Reid's supplemental declaration, which was produced two months before the deadline for CUI to identify its expert, CUI suffered no harm as a result of the report's shortcomings.  At first blush, the exclusion of Reid's report seems particularly damaging to Olmstead when combined with the district court's holding that only experts and counsel would be able to view the CUI software.  It is true, also, that "Rule 37(c)(1) does not compel the district judge to exclude testimony in its entirety." *Roberts*, 325 F.3d at 784.  However, as discussed below in relation to Olmstead's copyright claim, even Reid's supplemental declaration fell woefully short of the rigorous abstraction-filtration-comparison analysis required to find substantial similarity in copyright claims.  Neither Reid's report nor his additional declaration makes any attempt to identify those elements of the Olmstead software that are unique and original, rather than necessary to the function of any credit union software.  Therefore, Olmstead has not met its burden of showing that its Rule 26 errors were harmless or justified.

3.  The Deposition of Craig Minch

Olmstead was not entitled to take the deposition of Craig Minch because CUI re-designated Minch as a non-testifying expert.  Federal Rule of Civil Procedure 26(b)(4)(A) states that a "party may depose any person who has been identified as an expert witness whose opinions may be presented at trial."  In the case of a non-testifying expert, a party is only entitled to take the deposition of another party's expert upon a showing of special circumstances.  Fed. R. Civ. P.  26(b)(4)(B).

The district court correctly determined that Olmstead was not entitled to depose Minch before the court ruled on the pending motions for summary judgment, even though CUI originally designated Minch as a testifying expert.  As the district court stated, "the overwhelming majority of courts hold that a party may re-designate an expert as non-testifying, and that this insulates the expert from deposition by other parties absent a showing of 'exceptional circumstances.'"  *See, e.g.*, *In re Shell Oil Refinery*, 132 F.R.D. 437, 440 (E.D. La. 1990).  This position is consistent with the

purpose of Rule 26(b), which is to help lawyers prepare to cross-examine expert witnesses who will testify at trial.  Fed. R. Civ. P. 26, advisory committee's note (1970).

Olmstead argues that CUI's re-designation of Minch was an unfair attempt to prevent CUI from deposing Minch and a violation of Rule 26(b)(4)(A).  However, Rule 26(b)(4)(A) says nothing about the timing of the deposition of an expert witness, except that if the expert witness is required to file a report, the deposition may only occur after the report is provided.  Olmstead has not pointed to any case or rule stating that a district court abuses its discretion in not allowing an opposing party to take an expert witness's deposition *before* ruling on summary judgment motions. Olmstead seeks to use Minch's deposition testimony to survive summary judgment, hoping that Minch will testify that there were enough similarities between Olmstead's software and CUI's software to create a genuine issue of material fact.  Such use of an opponent's experts is what the revisers of Rule 26 sought to avoid:

> Past judicial restrictions of discovery on an adversary's expert, particularly as to his opinions, reflect the fear that one side will benefit unduly from the other's better preparation.  The procedure established in subsection (b)(4)(A) holds the risk to a minimum.  Discovery is limited to trial witnesses, and may be obtained only at a time when the parties know who their expert witnesses will be.  A party must as a practical matter prepare his own case in advance of [the time when the parties designate their expert witnesses], for he can hardly hope to build his case out of his opponent's experts.

Fed. R. Civ. P. 26, advisory committee's note (1970).  Olmstead sought to do what the procedure mandated by Rule 26 sought to proscribe—build a case on the basis of an opponent's expert.  Therefore, the district court did not abuse its discretion in refusing to compel the deposition of Craig Minch.

## B. Spoliation

The district court did not abuse its discretion in declining to sanction CUI for the CSE Credit Union's destruction of Olmstead's hard drives, which prevented Olmstead's forensic experts from determining whether CUI programmers had accessed the Olmstead software source code, because the district court's decision balanced the lack of any

assertion of wrongdoing by CUI with the harm caused to Olmstead's claims, and because Ohio law provides a remedy for a party injured by another party's spoliation of evidence.

That the CSE Credit Union's destruction of the hard drives may have constituted spoliation of evidence does not require a different result. "[A] federal court's inherent powers include broad discretion to craft proper sanctions for spoliated evidence." *Adkins v. Wolever*, 554 F.3d 650, 651 (6th Cir. 2009) (en banc). This power "arises not from substantive law, but, rather, 'from a court's inherent power to control the judicial process.'" *Id.* at 652 (quoting *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001)). As this court and its "sister circuits have recognized, a proper spoliation sanction should serve both fairness and punitive functions." *Id.* The district court based its decision not to sanction CUI for the CSE Credit Union's destruction of evidence on CUI's lack of fault, thereby addressing the punitive aspect of the sanctions inquiry. Olmstead argues that the court erred in failing to consider the fairness aspect, stating that "CUI should not be permitted to benefit from the act of spoliation committed by its joint venturer, CSE." But this fairness aspect cuts both ways, as the potential for unfairness exists if CUI were sanctioned for conduct in which it was not involved. Several jurisdictions have addressed these fairness concerns raised by third-party spoliation by recognizing an independent tort of spoliation. *See* Phoebe L. McGlynn, Note, *Spoliation in the Product Liability Context*, 27 U. Mem. L. Rev. 663, 691-92 (1997). As the district court discussed, Ohio recognizes intentional spoliation of evidence as an independent cause of action that may be brought against either the primary defendant to an action or the third party to the action. *See Smith v. Howard Johnson Co.*, 615 N.E.2d 1037, 1038 (Ohio 1993). Olmstead brought an independent claim of intentional spoliation against the CSE Credit Union under Ohio law, and Olmstead eventually settled all claims with the CSE Credit Union. Thus, Olmstead was not left without a remedy for any harm caused by the CSE Credit Union's spoliation, and the district court did not abuse its discretion in declining to impose a sanction on CUI.

C. Copyright Infringement

On the merits, CUI was entitled to summary judgment with respect to Olmstead's copyright infringement claims because Olmstead has not produced any direct evidence of copying and Olmstead's indirect evidence of copying was not sufficient to create a fact question as to whether copying occurred. To prevail in an action for copyright infringement, "a plaintiff must establish that he or she owns the copyright creation, and that the defendant copied it." *Kohus v. Mariol*, 328 F.3d 848, 853 (6th Cir. 2003). A plaintiff can show copying in two ways, either through direct evidence of copying, or by indirect evidence. *Id.* at 853-54. When there is no direct evidence of copying, "a plaintiff may establish 'an inference of copying by showing (1) access to the allegedly-infringed work by the defendant(s) and (2) a substantial similarity between the two works at issue.'" *Id.* (quoting *Ellis. v. Diffie*, 177 F.3d 503, 506 (6th Cir. 1999)). Because Olmstead has no direct evidence of copying and was not able to create a triable question of fact through indirect evidence, CUI was entitled to summary judgment on Olmstead's copyright infringement claim.

The district court correctly determined that Olmstead presented no direct evidence of copyright infringement. All of the facts Olmstead listed as direct evidence of copying require a factfinder to infer that copying occurred based on circumstantial evidence. According to Olmstead, "CUI's programmers accessed the Olmstead software multiple times per week while engaged in their development work"; CUI's programmers met with CSE Credit Union employees who had worked as tellers and had experience with the Olmstead system; a former CSE Credit Union employee who was familiar with the Olmstead software was responsible for designing the CUI interface; and one CSE Credit Union teller stated that although she eventually received training on the CUI system, she did not receive any training on the day that the CSE Credit Union transferred from the Olmstead software to the CUI system. Even construed in the light most favorable to Olmstead for summary judgment, all of this evidence still requires a factfinder to infer that copying occurred; therefore the district court correctly determined that Olmstead did not produce any direct evidence of copying.

Olmstead's indirect evidence of copying is also not sufficient to create a fact question as to whether copying occurred. In order to prove copying through indirect evidence, a plaintiff must show "(1) access to the allegedly-infringed work by the defendant(s) and (2) a substantial similarity between the two works at issue." *Kohus*, 328 F.3d at 854. It is not disputed that CUI programmers were able to access the non-literal elements of Olmstead's software—the user interface—but it is at the substantial similarity inquiry that Olmstead's claim fails. The elements of the copyrighted work that are copied must be original, and "before comparing similarities between two works a court should first identify and eliminate those elements that are unoriginal and therefore unprotected." *Id.* at 853. In *Kohus*, this court applied a two-step approach for determining whether substantial similarity exists, where the factfinder first asks what aspects of the copyrighted work, if any, are protected, and then asks whether the second work involves elements that are substantially similar to the protected elements of the original work. *Id.* at 855. *Kohus* involved alleged copying of a latch designed for use in playground equipment, and we determined that expert testimony was likely necessary to "establish what elements, if any, are necessary to the function of any latch designed for the upper arm of a collapsible playyard." *Id.* at 856. Here, CUI has maintained throughout the litigation that any alleged similarities arose from the fact that both software programs were designed to serve the functions of credit unions, yet Olmstead has not attempted to identify any original elements of its software that CUI copied. Because Olmstead has failed to produce evidence creating a question of fact as to whether CUI copied original elements of its software, CUI was entitled to summary judgment on Olmstead's copyright infringement claims.

The only indirect evidence offered by Olmstead in support of substantial similarity is Tracie Rodriguez's testimony regarding the transition between the CUI and Olmstead software, but this testimony fails to create a triable question of fact. As the district court discussed, Rodriguez stated about the transition that "[t]here was work involved, I mean, there was problems at first." Moreover, Lash testified that CUI employees were provided with "a lot" of support during the transition, and that there

were "a couple weeks" dedicated to providing "quite a bit" of training to CSE Credit Union employees on the new software.

Notably, in its brief before this court, Olmstead blames its inability to provide any real analysis of substantial similarity on the district court's evidentiary rulings. However, as discussed earlier, the district court did not abuse its discretion in governing discovery in this case. Moreover, the evidence that Olmstead did obtain, even if considered by the district court, would not be sufficient to create a question of fact as to whether CUI copied original elements of Olmstead's software. Neither Reid's report, nor Reid's additional declaration provided by Olmstead in an attempt to cure the deficiencies in the report, even begins to provide the kind of abstraction-filtration-comparison analysis we applied in *Kohus*, *id.* at 855 n.1, and that the district court found lacking. As mentioned above, under *Kohus*, the factfinder determines substantial similarity first by asking what aspects of the copyrighted work, if any, are protected, and then by asking whether the second work involves elements that are substantially similar to the protected elements of the copyrighted work. *Id.* at 855. All of the evidence offered by Olmstead clearly lacks the abstraction and filtration elements. Olmstead has not attempted to identify those elements of its software that are original; thus its substantial similarity analysis does not filter elements that would be expected to be common to any credit union software, those dictated by the particular business practices. Although the additional Declaration of Robert Reid improves upon Reid's initial expert report in that it specifically identifies certain elements of CUI's software that are similar to Olmstead's software, Reid does not opine on whether those elements are original elements.[2] Thus, even Reid's additional report fails to create a question of fact as to whether CUI copied original elements of Olmstead's software.

---

[2] Of the more than 25 similarities in the software specifically identified in Reid's additional declaration, many are still vague. For example, Reid writes, "RCO pgs 113, 114 and UC 29 are very similar;" Reid also states, "RCO 123, 124 and UC 37, Audit trial is similar." Moreover, the only analysis possibly related to originality occurs when Reid lists the use of the terms "base accounts" and "sub accounts" in both programs as "unique," and when Reid states that both programs have the ability to keep customer records forever and that Olmstead told Reid during his interview with Olmstead that this was a unique feature of their system.

Because Olmstead has not created a triable question of fact as to whether CUI copied original elements of the Olmstead software, CUI was entitled to summary judgment on Olmstead's copyright infringement claims.

### D. Trade Secrets

The district court correctly held that Olmstead's end user product—the RCO-1 interface—was not a trade secret because Olmstead did not take reasonable steps to maintain its secrecy. CUI was therefore entitled to summary judgment with respect to Olmstead's trade secrets claim because Olmstead's end use product was not a trade secret and Olmstead did not produce any evidence indicating that CUI accessed the Olmstead source code.

The summary judgment evidence showed that the RCO-1 interface was not a trade secret. In Ohio, "trade secret" means:

> information . . . that satisfies both of the following:
> (1) It derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
> (2) It is the subject of efforts that are reasonable to maintain its secrecy.

O.R.C. § 1333.61(D). The district court held that Olmstead's end user product was not a trade secret because Olmstead did not take reasonable steps to maintain its secrecy. The court stated that Olmstead's own president had testified that the Olmstead interface is not a trade secret, that Olmstead's contract with the CSE Credit Union did not contain any confidentiality provisions preventing third parties from viewing the interface, and that the agreement expressly contemplated that the CSE Credit Union would use a third-party personal computer support firm to assist with support and to provide the terminal emulation software. These factors, combined with Olmstead's inability to identify any affirmative steps it took to maintain the secrecy of its user interface, amply support the district court's determination that the Olmstead user interface was not a trade secret, so that summary judgment was proper on Olmstead's trade secrets claim.

Olmstead argues that the district court erred in concluding that the CSE Credit Union was permitted to issue CUI programmers passwords under the terms of the license agreement, but that does not change the fact that Olmstead did not take sufficient steps to maintain the secrecy of its user interface. Because the CSE Credit Union is no longer a party to this case, the question is not whether the CSE Credit Union breached any implied covenants in the contract not to compete (as Olmstead suggests by citing *SAS Institute, Inc. v. S&H Computer Systems, Inc.*, 605 F. Supp. 816, 827 (M.D. Tenn. 1985)), or whether the CSE Credit Union was, in fact, authorized to issue passwords to anyone it wished, but whether Olmstead took reasonable steps to protect the secrecy of its user interface. The license agreement between the CSE Credit Union and Olmstead stated that "[p]ersonal computers may be integrated with the R.C. Olmstead system through the use of terminal emulation software," and that "[i]t is the Credit Union's responsibility to acquire a local Personal Computer support firm to perform maintenance." Although Olmstead disputes the degree of access that third-party developers and support providers could have had by providing emulation software or support services, nothing in the agreement limited the ability of those third parties to view the software. Olmstead acknowledged that various third parties had developed programs to work with the Olmstead software, and it was in this capacity that Burkhardt and Akin began working with the CSE Credit Union and the Olmstead software. The record lacks any evidence of affirmative steps that Olmstead took to protect its alleged trade secret—its software interface.

In claiming that the RCO-1 interface is a trade secret, Olmstead relies almost entirely on its factually incorrect claim that the district court determined that CUI's interface was a trade secret, based on the district court's discovery ruling limiting Olmstead's access to the CUI software. As Olmstead sees it, fairness, the law-of-the-case doctrine, and the doctrine of estoppel all mandate that the trade secret status of the Olmstead interface is at least a question of fact, but this argument fails for two reasons. First, a finding that CUI's interface is a trade secret does not necessitate a finding that the RCO-1 interface is a trade secret. The RCO-1 interface is not a trade secret, due at least in part to Olmstead's lack of efforts to maintain its secrecy; that factor has no

bearing on whether CUI's end use product is a trade secret. Second, as the district court noted, it never determined that CUI's interface was a trade secret. In holding that only Olmstead's attorneys and experts could view the CUI end use product, the court stated that it "must acknowledge that CU Interface's end use product is proprietary in nature and its disclosure could cause CU Interface considerable damage." Yet Federal Rule of Civil Procedure 26(c)(1)(G) permits a district to court to protect, in addition to trade secrets, other types of confidential commercial information, research, or development. Moreover, as the district court noted in its discovery ruling, Olmstead did not challenge CUI's position that the end user product contains trade secrets, and the protective order to which the parties agreed mandated that only attorneys and experts could view "highly confidential material." The district court therefore based its order "solely upon RCO's concession—at no point did the Court make factual findings or hold as a matter of law that CUDP Circa 2005 was a trade secret."

The district court correctly determined that CUI was entitled to summary judgment on Olmstead's trade secrets claim.

III.

For these reasons, the order of the district court granting summary judgment to the defendants on all remaining claims is affirmed.

—————————————

**CONCURRENCE**

—————————————

KETHLEDGE, Circuit Judge, concurring. I join the court's opinion, and write briefly to emphasize that it was not only permissible, but salutary that the district court chose to enforce Rule 26(a)(2)(B) by striking Olmstead's expert report. The report was patently noncompliant with the Rule. Olmstead contends that it should have been given another chance to comply—that, essentially, it was entitled to a free violation—but in my view the district court was entirely right to reject that contention. The time to comply with the Rules is when the district court's scheduling order says to comply, not weeks later when faced with a motion for noncompliance. Every violation of the Rules has consequences; the question is who will bear them. Too often the consequences are borne only by the innocent party, who must live with the violation (here, a useless report) or else pay to brief and argue a motion to compel the offending party to do what the Rules required it to do all along. Better instead to make the offending party pay a price, and thereby also to remind others that they, too, should comply the first time.